UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| CINCINNATI INSURANCE COMPANIES<br>　　Plaintiff | )<br>)<br>)<br>) |
| PROGRESSIVE HAWAII INSURANCE CORPORATION<br>　　Intervening Plaintiff | )<br>)<br>)<br>)<br>) |
| v. | )　　NO. 2:03-CV-395 |
| SHADERICK M. BOGGS, *ET AL.*<br>　　Defendants | )<br>)<br>) |

## **MEMORANDUM OPINION**

The plaintiff, Cincinnati Insurance Companies ("Cincinnati"), seeks a declaratory judgment that the defendant, Shaderick Boggs ("Boggs")[1], is not entitled to liability or uninsured motorist coverage under two policies of insurance issued by Cincinnati to Boggs' employer, Fairway Ford. The intervening plaintiff, Progressive Hawaii Insurance Corporation ("Progressive") likewise seeks a declaration that Boggs is not an insured under an automobile insurance policy issued by Progressive to Ruth Larkins (Boggs' grandmother) which afforded liability and uninsured motorist coverage and which listed Boggs as a "listed driver" thereon. [Docs. 1 and 21].

---

[1] This action was originally filed against six (6) defendants. A default judgment has been entered against Charles Wynne, Administrator ad litem for the estate of Michael S. Eidson, Kathy Eidson, Robert W. King and Rodney Boggs. Billy Jack Smith, Administrator for the estate of Judith A. Smith, although he answered the complaint filed, has not further participated in the case and did not appear at the trial.

Jurisdiction is asserted on the basis of diversity and amount in controversy pursuant to 28 U.S.C. § 1332. A bench trial was conducted on November 30, 2005, and the matter was taken under advisement. For the reasons expressed below, Cincinnati and Progressive will be granted a declaratory judgment that Boggs is not entitled to coverage under the policies of insurance issued by them.

I. **THE POLICIES OF INSURANCE**

Fairway Ford is the named insured under a garage coverage policy (No. CPA 0674345) and an umbrella liability policy (No. CCC 4400382) issued by Cincinnati. The Insuring Agreement of the Garage Coverage Form (AA 102 09 00) provides as follows:

> We will pay all sums an "insured" legally must pay as damages because of "bodily injury" or "property damage" to which this insurance applies, caused by an "accident" and resulting from "garage operations" involving the ownership, maintenance or use of covered "autos".

The policy further provides:

The following are "insureds" for "covered" autos:

> * * *
>
> (2) Anyone else while using with your [Fairway's] permission a covered "auto" you [Fairway] own, hire or borrow except:
>
> * * *
>
> (b) Your customers, if your business is shown in the

2

declarations as an "auto" dealership.

The Garage Coverage Form is amended by a Tennessee Uninsured Motorists Coverage Endorsement (AA 480 TN 0601) which states that Cincinnati "will pay all sums the 'insured' is legally entitled to recover as compensatory damages for the owner or driver of an 'insured motor vehicle'." For purposes of this endorsement an insured includes:

> Employees of the Named Insured, but only for injuries arising out of and incurred while in the course and scope of employment for the Named Insured shown in the Declarations of this Coverage Form.

The Insuring Agreement of the Umbrella policy likewise states that Cincinnati:

> Will pay on behalf of the insured the "ultimate net loss" which the insured is legally obligated to pay as damages in excess of the "underlying insurance" or for an "occurrence" covered by this policy which is either excluded or not covered by "underlying insurance" because of "bodily injury" or "property damage" . . . "personal injury" or "advertising injury" . . .

The Umbrella also provides that:

Each of the following is also an insured:

> a. Any "executive officer", director, "employee" or stockholder of yours while acting within the scope of their duties as such.

Progressive issued policy 10817232-3 to Ruth Larkins which afforded, among other things, bodily injury liability and uninsured motorist coverage. The

3

Progressive policy listed Boggs as a "listed driver" thereon.

Under "PART I - LIABILITY TO OTHERS" of the Progressive policy, the same provides the following relating to the "insured agreement":

> INSURING AGREEMENT
> Subject to the Limits of Liability, if you pay the premium for liability coverage, we will pay damages for bodily injury and property damage for which an insured person
> becomes legally responsible because of an accident arising out of the:
> 1. ownership, maintenance, or use of a vehicle; or. . .."

Additionally, under a section entitled "ADDITIONAL DEFINITIONS", an "insured person" is provided coverage "with respect to an accident arising out of the maintenance or use of any vehicle with the express or implied permission of the owner of the vehicle" (1(d) p.6). Furthermore, the "Insuring Agreement", under Part III (p. 10) pertaining to uninsured motorist coverage in the Progressive policy, contains the following language:

> UNINSURED MOTORIST COVERAGE INSURING
> AGREEMENT - UNINSURED MOTORIST BODILY
> INJURY COVERAGE
> Subject to the Limits of Liability, if you pay the premium for Uninsured Motorist Bodily Injury Coverage, we will pay for damages, other than punitive or exemplary
> damages, which an insured person is legally entitled to recover from the owner or operator of an uninsured motor vehicle because of bodily injury:

4

      1. sustained by an insured person;
      2. caused by an accident; and
      3. arising out of the ownership, maintenance, or use of an uninsured motor vehicle.

This coverage, however, contains the following exclusion (p. 18) as relates to a non-owned vehicle operated outside the express or implied permission of its owner:

> EXCLUSIONS - READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III.
>
> 1. Coverage under this Part III is not provided for bodily injury sustained by any person while using or occupying:. . .
>
>     c. a non-owned vehicle without the express or implied permission of the owner; or . . .

Thus, in order to be entitled to benefits under the Cincinnati policies, the defendant, Boggs must have been injured in the course and scope of his employment for Fairway or operating the vehicle with Fariway's permission at the time the alleged injuries were incurred. The Progressive policy would provide coverage to Boggs with respect to the alleged injuries if the accident arose out of the maintenance or use of any vehicle with the express or implied permission of the owner of the vehicle.

II. **FINDINGS OF FACT**

Most of the relevant facts in this case are either undisputed or stipulated to by

the parties. The primary factual dispute between the parties involves the scope of the permission given to Boggs for the use of the vehicle of Fairway Ford at the time of the accident which precipitated the filing of this action. This Court FINDS the following to be the facts of this case:

On June 19, 2002, at approximately 2:00 a.m., Shaderick Boggs, while driving a 2001 Pontiac Grand Am owned by his employer, Fairway Ford, was involved in a three vehicle accident on Interstate 181 in Kingsport, Tennessee. A vehicle driven by Michael Eidson ("Eidson") was traveling down the wrong side of the Interstate when it collided head-on with a vehicle operated by Judith Smith ("Smith"). The vehicle driven by Boggs was then involved in a secondary collision with the vehicle operated by Smith. Smith and Eidson were both killed as a result of the collision. Three passengers in Boggs' vehicle sustained injuries. As a result of this automobile accident, four (4) state court lawsuits were filed by or against Boggs. Each of the complaints filed against Boggs alleges that he was operating the 2001 Pontiac Grand Am in the scope of his employment with and with the permission of Fairway Ford at the time of the accident.

Boggs was employed by Fairway Ford primarily as a new car salesman and had worked his regular hours on June 18, 2002. He had worked at Fairway Ford for about two years and was paid on a commission basis. Fairway Ford had taken ownership of the 2001 Pontiac Grand Am involved in the June 19, 2002 accident as a trade-in

6

from one of Boggs' customers on June 18. The Grand Am had been taken across the street to the used car lot[2] by Boggs for appraisal to establish a trade-in value. By the time he completed the deal involving the Grand Am, the dealership was closing and it was 7:00 to 8:00 p.m. when Boggs left Fairway Ford, driving the 2001 Pontiac Grand Am.

Boggs argues that he had both a general grant of authority to drive automobiles owned by Fairway Ford and that he had specific permission to drive the Grand Am at the time of this accident. He testified that he had driven numerous vehicles owned by Fairway Ford over the prior six months on personal errands or to lunch and overnight and that he often took Fairway Ford vehicles overnight to show them to potential customers. The weight of the evidence, however, establishes otherwise. Only those employees of Fairway Ford with "demonstrator" privileges were permitted personal use of company vehicles. Other employees were not allowed to use company cars for personal use. Boggs did not have demonstrator privileges and dealership vehicles were driven off the lot only for customer test drives or for gas fill-up. Employees were not permitted to take automobiles owned by the dealership after regular business hours or overnight for the purpose of showing them to prospective customers.

---

[2] Apparently, Fairway Ford maintains separate lots for its new and used car operations. These lots are across the street from each other, however.

While all parties agree that Boggs had the permission of Fairway Ford to drive the Grand Am when he left the dealership on June 18, 2002, they disagree about the scope of the permission given. Boggs maintains that he had "permission to take the vehicle as a means of transportation while his personal vehicle was in the shop being repaired at Fairway Ford and also to drive it to Johnson City in order to show it to some of his fraternity brothers as potential buyers" on the date of the accident. Once again, however, the weight of the evidence establishes otherwise. Sometime in the late afternoon on June 18, 2002, Boggs did in fact ask Elliott Smith, the used car manager for Fairway Ford, for permission to drive the 2001 Pontiac Grand Am home. Smith originally said "no" after being asked twice but then relented, allowing Boggs to take the vehicle home and return to the dealership with it the following morning.[3] Smith gave very explicit instructions to Boggs to take the vehicle nowhere other than to his home and return the following morning,[4] and would not have permitted Boggs to take the vehicle had he known he was planning to go to Johnson City.

---

[3] Apparently Boggs had been driving a high top Dodge conversion van owned by his grandmother during the time Boggs' personal vehicle was in the Fairway Ford service department. This van had been sold to a wholesaler a day or so before the accident and Boggs was apparently without a personal vehicle at that time.

[4] Boggs argues that he not only had permission to take the vehicle home but that he also had permission to take the vehicle to Johnson City for the purpose of showing it to his fraternity brothers in an effort to sell the vehicle. Boggs' own testimony before this Court contradicts that assertion, however, in that Boggs testified that he did not make specific plans to go to Johnson City until after he left work and had a telephone conversation with one or more of his fraternity brothers. In addition, Boggs testified that he had no specific plans when he left the dealership on June 18, 2002. In short, this Court does not believe that Boggs ever discussed with Smith or any other agent of Fairway Ford the possibility of taking the vehicle to Johnson City for the purpose of showing it to prospective customers. This Court did not find Boggs to be a very credible witness and has resolved most credibility issues against Boggs.

After leaving the dealership with his brother as a passenger in the Grand Am automobile, Boggs apparently went home and then to Johnson City where he had dinner at O'Charleys' restaurant around 9:00 or 10:00 p.m. He later went to the Pi Kappa Alpha fraternity house in Johnson City where he remained for about two hours. Boggs admittedly consumed alcohol while in Johnson City.[5] On his return from Johnson City, Boggs was involved in the accident described above.

III. **ANALYSIS**

*Permissive Use*

An insured is defined under the terms of the Cincinnati policy of insurance issued to Fairway Ford as anyone using a covered automobile with Fairway Ford's permission. The uninsured motorist coverage in the policy issued by Progressive to Boggs' grandmother excludes coverage for any person while using or occupying a non-owned vehicle without the express or implied permission of the owner. Thus, under both policies, the question of whether or not Boggs has coverage and the right to a defense and indemnity turns on the question of whether or not he was a permissive user of the Grand Am, which in turn turns on the distinction between general custody and limited permission to use the insured automobile. In cases of the former, the initial

---

[5] Once again, Boggs' testimony is not credible on this issue. He testified that he consumed only three or four beers over a four or five hour period before the accident, which occurred at approximately 2:00 a.m. His blood alcohol level was .15, however, at 5:40 a.m., some three and one-half hours after the accident. In fact, Boggs pled guilty to a charge of reckless endangerment as a result of the accident and served six months imprisonment.

9

permission will render the insurance applicable even though the party given custody causes an injury while using the automobile for reasons not contemplated by the owner. In the later case of limited permission, the initial permission does not extend the authorized use beyond the limitation placed thereon and if injury results from use beyond the permission given, the policy does not cover the loss. *Employers Insurance of Wausau v. Woodruff*, 568 S.W. 2d 625 (Tenn. Ct. App. 1978).

Any analysis of this issue must begin with the ruling of the Tennessee Supreme Court in *Stovall v. New York Indemnity Company*, 8 S.W. 2d 473 (Tenn. 1928), the case primarily relied upon by Boggs. In *Stovall*, the Tennessee Supreme Court determined that an employee, a traveling salesman, who was provided with a vehicle for use in covering his territory, was an insured despite the fact that at the time of the accident he was operating the vehicle approximately 135 miles out of his territory for private purposes when he was involved in an accident. In holding that the employee was an insured, the Supreme Court stated as follows:

> If, however, the automobile covered by the policy is delivered to another for use, with the permission of the owner or insured, his subsequent use of it is with the permission of the insured, within the meaning of the policy, regardless of whether the automobile is driven to a place or for a purpose not within the contemplation of the insured when he parted with possession.

*Id.* at 477.

10

In so holding, Tennessee aligned itself with a minority of courts which hold "that if permission or authority to take and use the car in the first instance is granted a party, then, even though that party goes off and uses the car for other purposes than that of initial permission, the driver of the car is covered under the 'omnibus' clause." *Foley v. Tennessee Odin Insurance Company*, 193 Tenn. (29 Bealer) 206, 245 S.W. 2d 202, 203 (1951). The Supreme Court retreated somewhat from the *Stovall* rule in *Hubbard v. U.S. Fidelity & Guaranty Company*, 192 Tenn. 210, 240 S.W. 2d 245 (1951). In *Hubbard*, the court held that:

> The initial permission is not controlling where the use is limited to a specific purpose for a limited time and the driver takes the car for his own purposes and has an accident when using the car in a complete departure from any business of or permission by the owner.

*Id.* at 217.

Shortly after deciding the *Hubbard* case, the Supreme Court again clarified the rules related to permissive use in *Moore v. Liberty Mutual Insurance Company*, 193 Tenn. (29 Beeler) 519, 246 S.W. 2d 960 (1952). According to the *Moore* court:

> [W]here one has only limited permission of the owner to use the car in a specified area for a limited time and particular purpose and does not have general discretion as to the use of the car, then the coverage of the omnibus clause is not extended to his use of the car any place or for a purpose not consented to nor reasonably contemplated by the owner in giving the initial permission.

11

193 Tenn. at 522, 246 S.W. 2d at 961. Shortly after the *Moore* decision, the Sixth Circuit Court of Appeals addressed the same issue in *Branch v. U.S. Fidelity & Guaranty Company*, 198 F. 2d 1007 (6th Cir. 1952) and stated:

> In our opinion, the controlling rule of law in Tennessee, as it presently exists, is as expressed in the case of Moore v. Liberty Mutual Ins. Co., supra, its latest ruling on the question, which draws the distinction between general custody of and limited permission to use the insured automobile, rejecting the earlier rule announced in the *Stovall* case that liability exists where the original possession of the car was with the permission of the owner, regardless of its unauthorized and unanticipated use thereafter.

198 F. 2d at 1011.

These cases clearly turn upon the distinction between general custody and limited possession. General custody means that there has been permission to use a vehicle generally or in the course of conduct or practice with knowledge and acquiescence of the employer, such as would indicate to a reasonable mind that the employee had the right to assume permission under particular circumstances. *Moore* at 522, 523 citing *U.S. Fidelity & Guaranty Company v. Brann*, 297 Ky. 381, 180 S.W. 2d 102 (Ky. Ct. App. 1944).

Applying these rules to the case at bar, it is quite clear that Boggs enjoyed no grant of general custody of the 2001 Pontiac Grand Am owned by Fairway Ford which he was driving at the time of the accident on June 19, 2002. Thus, the "liberal" view urged by the defendant as set forth in *Stovall* has no application to this case. While

12

Boggs clearly had the permission of Fairway Ford to use the Grand Am at the time of the accident, he had only limited permission "to use the car in a specified area for a limited time and particular purpose" and did not have "general discretion as to the use of the car . . ." Insurance coverage was not, therefore, extended to Boggs by his use of the vehicle on June 19, 2002, for a purpose not consented to nor reasonably contemplated by Fairway Ford.

*Scope of Employment*

The determination by this Court that Boggs was not a permissive user of the 2001 Pontiac Grand Am he was operating at the time of the accident on July 19, 2002, is not the end of the analysis in this case. Based upon the policy language, Boggs would still be entitled to coverage under the uninsured motorist provisions of the Cincinnati policy which defines an insured as an employee of the named insured, "but only for injuries arising out of and incurred while in the course and scope of employment . . ." and the umbrella policy which also defines an insured as an employee "while acting within the scope" of his duties. Boggs claims coverage under these policy provisions on the basis that he was acting within the course and scope of his employment by taking the Fairway Ford automobile to Johnson City to show to prospective customers and that his employment was essentially 24 hours a day since he was paid by a commission only.

13

The standard for determining whether or not an employee was acting within the scope of his employment for insurance coverage purposes appears to be essentially the same as for determining whether or not an employer is vicariously liable for the torts of an employee under the doctrine of respondeat superior.[6] *See TN Farmers Mutual Ins. Co. v. American Mutual Liability Ins. Co.*, 840 S.W. 2d 933 (Tenn. Ct. App. 1992). In order to hold an employer liable, the plaintiff must prove (1) that the person who caused the injury was an employee, (2) that the employee was on the employer's business, and (3) that the employee was acting within the scope of his employment when the injury occurred. *Hamerick v. Spring City Motor Company*, 708 S.W. 2d 383, 386 (Tenn. 1986). The parties have stipulated that Boggs was an employee of Fairway Ford. The Restatement (Second) of Agency sets forth the theoretical framework for deciding whether an employee's conduct is within the scope of his employment under Tennessee law. Restatement (Second) of Agency § 228 (1957) provides:

> (1) Conduct of a servant is within the scope of employment if, but only if:

---

[6] While not raised by the defendant, the presumptive use statute (*Tenn. Code Ann*. § 55-10-311) has been called to the Court's attention by Cincinnati. That statute provides that proof of ownership of a vehicle "shall be *prima facie* evidence that the vehicle at the time of the action sued on was being operated and used with authority, consent and knowledge of the owner . . . [and] for the owner's use and benefit and within the course and scope of the servant's employment." This presumption can be overcome and disappears when credible evidence is offered showing that the driver was in fact operating the vehicle without authority of the owner. *Bell Cab & U-Drive-It Company v. Slone*, 193 Tenn. 352, 246 S.W. 2d 41 (1952); *Ferguson v. Tomerlin*, 656 S.W. 2d 378 (Tenn. Ct. App. 1983). To the extent the presumptive use statute is at issue in this case, this Court finds that the presumption has been rebutted by credible proof that Boggs was in fact operating the vehicle without the authority of Fairway Ford.

14

(a) it is of the kind he is employed to perform;
(b) it occurs substantially within the authorized time and space limits;
(c) it is actuated, at least in part, by a purpose to serve the master; and
(d) if force is intentionally used by the servant against another, the use of force is not unexpectable by the master.

(2) Conduct of a servant is not within the scope of employment if it is different in kind from that authorized, far beyond the authorized time and space limits, or too little actuated by a purpose to serve the master.

*Tenn. Farmers Mutual Ins. Co. v. American Liability Ins. Co.*, 840 S.W. 2d 933, 938 (Tenn. Ct. App. 1992 quoting Restatement (Second) of Agency § 228 (1957))

When an employee's job requires travel, an employer may be vicariously liable for the employee's negligence while traveling. The threshold issue in cases involving travel is whether the employment caused the necessity for travel. *Tenn. Farmers Mutual* at 938; *Daniels v. White Consolidated Industries, Inc.*, 692 S.W. 2d 422, 424-25 (Tenn. Ct. App. 1985). If the employee's duties created a necessity for travel, then the employee is within the scope of employment while traveling, as long as the employee does not deviate from the employer's business and engage in conduct the employer had no reason to expect. *Tenn. Farmers Mutual* at 938; *Cunningham v. Union Chevrolet Company*, 177 Tenn. 214, 220, 147 S.W. 2d 746, 748 (1941). Important considerations are whether the trip would have taken place even without the

15

business reasons (if so, then the trip is personal and not within the scope of employment) and whether the trip was one that would have required the employer to send another employee or to perform the same function if the trip had not been made (if so, the trip is within the scope of employment). *Tenn. Farmers Mutual* at 938-939.

The proof in this case establishes that Boggs was an employee of Fairway Ford and that his primary job duties consisted of the sale of new automobiles. The proof also established that Boggs had specified days, and times and place of work. While employees of Fairway Ford were encouraged to cultivate prospects in the community, after hours showing of automobiles to prospective customers was prohibited. In fact, employees were not permitted to remove automobiles from the Fairway Ford lot to show to prospective purchasers without specific authorization from Fairway Ford management. Fairway Ford did not provide the use of an automobile for employees while cultivating prospects and the cultivation of prospects was not within the specified job description of Boggs. Boggs' activities after work hours were not within the control of Fairway Ford. Thus, even assuming that the purpose of Boggs' trip to Johnson City on June 18-19, 2002 was for the purpose of showing the 2001 Pontiac Grand Am to prospective customers, his conduct was different in kind from that authorized by his employer, occurred beyond his authorized work hours and space limits and had only a slight attenuation of purpose to serve the master. Thus, under the Restatement (Second) of Agency § 228, Boggs was not acting within the scope of

16

his employment at the time of the accident in this case and is not entitled to coverage pursuant to the terms of the Cincinnati policy.

III. **CONCLUSION**

For the reasons expressed above, a declaratory judgment will be entered in favor of Cincinnati and Progressive declaring that the defendant, Shaderick M. Boggs, is not entitled to coverage under any of the insurance policies issued by Cincinnati and Progressive, nor is he entitled to a defense or indemnity.

A judgment will enter.

ENTER:

s/J. RONNIE GREER<br>UNITED STATES DISTRICT JUDGE